Citation Nr: 1641938 
Decision Date: 10/31/16 Archive Date: 11/08/16

DOCKET NO. 08-20 428 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Waco, Texas


THE ISSUES

1. Entitlement to service connection for a left shoulder disability, to include as secondary to a service-connected disability.

2. Entitlement to service connection for an acquired psychiatric disorder, variously diagnosed.

3. Entitlement to a compensable evaluation for right tibial stress fracture.


REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the United States


WITNESS AT HEARING ON APPEAL

Appellant

ATTORNEY FOR THE BOARD

P. Olson, Counsel


INTRODUCTION

The Veteran had active military service from April 1989 to February 1998 with additional service with the Army National Guard with periods of active duty for training and inactive duty training from February 1998 until April 2007. The Veteran also had service in Southwest Asia from October 1990 to April 1991.

The issues of entitlement to service connection for a left shoulder disorder and entitlement to a compensable evaluation for right tibial stress fracture are before the Board of Veterans' Appeals (Board) following a Board Remand in August 2010. These issues were originally on appeal from a January 2008 rating decision of the Department of Veterans Affairs (VA), Regional Office (RO) in Waco, Texas.
The issue of entitlement to service connection for an acquired psychiatric disorder comes before the Board on appeal from a February 2013 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in Waco, Texas.

The United States Court of Appeals for Veterans Claims (Court) in Clemons v. Shinseki, 23 Vet. App. 1 (2009), has held that an initial claim of entitlement service connection for posttraumatic stress disorder (PTSD) should be read as including other psychiatric disorder diagnoses reasonably raised by the symptoms described and all information obtained in support of the claim. Consequently, the Veteran's claim for PTSD has been expanded to include consideration of all acquired psychiatric diagnoses reflected in the record.

In July 2016, the Veteran testified at a videoconference hearing. A transcript of that hearing is of record.

The claims file is now entirely in VA's secure electronic processing systems, Virtual VA and Veterans Benefits Management System (VBMS).

The issues of entitlement to service connection for a left shoulder disability and entitlement to a compensable evaluation for right tibial stress fracture are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDING OF FACT

The Veteran has an acquired psychiatric disorder, variously diagnosed, that has been linked to his fear of hostile military action in the Persian Gulf War in 1991. 


CONCLUSION OF LAW

With resolution of reasonable doubt in the Veteran's favor, the criteria for service connection for an acquired psychiatric disorder, variously diagnosed, have been met. 38 U.S.C.A. § 1110 (West 2014); 38 C.F.R. §§ 3.303, 3.304(f) (2015).


REASONS AND BASES FOR FINDING AND CONCLUSION

As provided for by the Veterans Claims Assistance Act of 2000 (VCAA), VA has a duty to notify and assist claimants in substantiating a claim for VA benefits. 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 (West 2014); 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2015). In light of the favorable outcome of this appeal, any perceived lack of notice or development under the VCAA should not be considered prejudicial. 
 
The Veteran seeks service connection for an acquired psychiatric disorder, to include PTSD.

The Veteran's active duty treatment records are absent complaints, findings or diagnoses of any psychiatric disorder during active service. On the June 1991 Southwest Asia Demobilization/Redeployment Medical Evaluation, the Veteran denied having nightmares, trouble sleeping, or recurring thoughts about experiences during Desert Shield/Desert Storm. On the Report of Medical History completed by the Veteran in June 1991, he denied having frequent trouble sleeping, depression or excessive worry, and nervous trouble of any sort. On National Guard examinations in November 1998 and February 2005, the Veteran's psychiatric health was evaluated as normal. On Report of Medical History completed by the Veteran in November 1998 in conjunction with his physical, he denied ever having frequent trouble sleeping, depression or excessive worry, and nervous trouble of any sort. Thus, there is no medical evidence that shows that the Veteran suffered from an acquired psychiatric disorder during active service. 

When a disease is first diagnosed after service, service connection can still be granted for that condition if the evidence shows it was incurred in service. 38 C.F.R. § 3.303(d). To prevail on the issue of service connection there must be evidence of a current disability, in-service incurrence or aggravation of a disease or injury; and a causal relationship between the current disability and the disease or injury incurred or aggravated during service. See Shedden v. Principi, 381 F.3d 1163, 1166-67 (Fed. Cir. 2004). 

To establish entitlement to service connection for PTSD the evidence must satisfy three basic elements. There must be medical evidence diagnosing PTSD; a link, established by medical evidence, between current symptoms of PTSD and an in-service stressor; and credible supporting evidence that the claimed in-service stressor occurred. 38 C.F.R. § 3.304 (f). A diagnosis of PTSD must be established in accordance with 38 C.F.R. § 4.125 (a), which simply mandates that, for VA purposes, all mental disorder diagnoses must conform to the criteria of the American Psychiatric Association's Diagnostic and Statistical Manual for Mental Disorders (DSM). During the appeal period, the criteria of DSM-IV initially applied but, following a revision to the DSM, VA now recognizes the application of DSM-V. See 79 Fed. Reg. 45099 (August 4, 2014). 

If the evidence establishes that the Veteran engaged in combat with the enemy and the claimed stressor is related to that combat, in the absence of clear and convincing evidence to the contrary, and provided that the claimed stressor is consistent with the circumstances, conditions, or hardships of the Veteran's service, the Veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor. 38 C.F.R. § 3.304 (f)(1); see also 38 U.S.C.A. § 1154 (b).

Effective July 12, 2010, VA amended its adjudication regulations which eliminated the requirement of evidence corroborating the occurrence of the claimed in-service stressor in claims in which PTSD was diagnosed in service and in some claims in which the claimed stressor is related to the claimant's fear of hostile military or terrorist activity. Specifically, 38 C.F.R. § 3.304 (f) was amended to read that if a stressor claimed by a Veteran is related to his fear of hostile military or terrorist activity and a VA psychiatrist or psychologist, or a psychiatrist or psychologist with whom VA has contracted, confirms that the claimed stressor is adequate to support a diagnosis of PTSD and that the Veteran's symptoms are related to the claimed stressor, in the absence of clear and convincing evidence to the contrary, and provided the claimed stressor is consistent with the places, types, and circumstances of the Veteran's service, the Veteran's lay testimony alone may establish the occurrence of the claimed in-service stressor.

"Fear of hostile military or terrorist activity" means that a Veteran experienced, witnessed, or was confronted with an event or circumstance that involved actual or threatened death or serious injury, or a threat to the physical integrity of the Veteran or others, such as from an actual or potential improvised explosive device; vehicle-imbedded explosive device; incoming artillery, rocket, or mortar fire; grenade; small arms fire, including suspected sniper fire; or attack upon friendly military aircraft, and the Veteran's response to the event or circumstance involved a psychological or psycho-physiological state of fear, helplessness, or horror.

The Veteran's DD Form 214, Certificate of Release or Discharge from Active Duty, indicates that the Veteran's primary specialty was a cavalry scout for eight years and five months. The U.S. Army website indicates that the cavalry scout is responsible for being the eyes and ears of the commander during battle. They engage the enemy in the field, track and report their activity, and direct the employment of weapon systems to their locations. Helpful skills include the readiness to accept a challenge and face danger. 

As noted above, the Veteran had service in Southwest Asia from October 1990 to April 1991. As a cavalry scout in Southwest Asia, it is entirely plausible that the Veteran experienced fear of hostile military activity. The Veteran's personnel record does not provide the necessary information to determine the exact area the Veteran was stationed while in Southwest Asia; however, the Veteran completed a VA Form 21-0781, Statement in Support of Claim for Service Connection for PTSD, on which he indicated that the day that the ground war started in January 1991 while assigned to BTRP 2-1 CAV 2AD attached to BTRP 107 CAV 1CD, a mission was given to do a staggered column tactical road march into Iraq at midnight. The Veteran reported that he was driving with the hatch down on the Bradley doing his best to watch the ground for anything but at about 3 a.m., the Bradley dropped head first about 30 feet injuring the Veteran, the Gunner, and two other scouts. The Veteran stated that he hit face first, tried to move, but passed out; and when he woke up, he was being treated for neck and head trauma. 

The Veteran also reported that in February 1991 while on a screen line mission at the Iraqi/Kuwait border, he encountered an Iraqi jeep scouting out the area. The Veteran stated that he got the order to stop and search the vehicle, but it began to head for the Kuwait border, turned around, and then headed straight at them. As it got closer, it turned 180 degrees and two soldiers jumped out with RPGs and another with a 50 caliber that he locked and loaded. The Veteran stated that he noticed two M60 tanks which had them marked. The Veteran stated that the whole time he thought, "This is it," but once the fact that he and the others were U.S. Army soldiers, the standoff ceased. The soldiers in the other group were Egyptian, and they recognized all U.S. vehicles except for the Bradley. 

The Veteran has been diagnosed with PTSD, adjustment disorder with mixed depression and anxiety, and unspecified trauma and stressor-related disorder.

A January 2011 letter from a private licensed professional counselor notes that the Veteran was a client and that she had seen him for individual counseling, that he had been diagnosed with PTSD, and that as part of his treatment plan, it was recommended that he attend regular counseling sessions until he was in full remission. 

Private medical records of Dr. Clay indicate that in February 2011, the Veteran presented a history of PTSD and that he was being seen for follow up and was started on citalopram and Ambien two weeks prior. It was noted that the Veteran had not yet been scheduled for an appointment at DePaul Clinic with psychiatry, but had been seen for private counseling. 

Private treatment records from DePaul Clinic indicate that the Veteran was seen in March 2011 and June 2011. After mental status examinations, the Veteran was diagnosed as having PTSD. 

The Veteran underwent VA examination in May 2011 at which time he reported a history of teenage depression and alcohol abuse and stated that he was put in a psychiatric hospital at age 15. The Veteran reported that he was arrested for assault with bodily injury when he assaulted a drug dealer and put him in the intensive care unit. The Veteran reported that he was told by a judge to leave town or go to jail; he decided to go into the military. 

The Veteran reported that he ran his tank off a cliff in the middle of the night during the initial ground invasion of Iraq and was 45 minutes behind the rest of his squadron and that on another occasion, he saw bodies of Iraqi soldiers that had been decapitated and dismembered. The Veteran reported intense fear, feeling of helplessness, and feeling of horror. 

The VA psychologist noted that diagnostically, the Veteran reported significant distress related to mental health issues over the prior five months as well as moderate symptoms of depression and mild symptoms of anxiety. The examiner noted that there did appear to be a history of subthreshold PTSD symptoms, that the Veteran had demonstrated remarkable coping skills until recently when he felt overwhelmed by life stressors (marital and occupational). The examiner noted that the Veteran certainly had a history of combat related stress exposure and had demonstrated subthreshold symptoms related to these experiences to date but did not at that time meet diagnostic criteria for PTSD. The examiner noted that the Veteran was likely to benefit from intensive psychiatric and psychological services and that without treatment, his condition was likely to continue to deteriorate. The examiner noted that it was possible that PTSD symptoms could increase over time in response to other life stressors and that the Veteran could experience increased difficulty in psychosocial functioning. 

The Veteran underwent VA examination in July 2015 at which time he report no mental health treatment prior to the military service. He reported that once he had some childhood depression and his mother took him to the hospital and the psychiatrist said basically it was separation issues caused by his mother keeping him from seeing his father. The Veteran reported no psychiatric hospitalizations. He reported a history of mental health treatment during his time in the military and noted that he had depression which was never documented. 

The Veteran reported, 

during the 1st Gulf War we were running a mission between the three countries, Iraq-Kuwait, spotted a jeep that drew us around the border and made a turn towards us, we knew who they were they didn't know who we were, they stopped and a tarp came off, two people came up with RPG and 50cal, I focused further out and there were two Russian tanks focused on us, so we had 2 guys with RPG's a 50 caliber and 2 tanks, it was pretty much like time stopped, if anybody had just sneezed myself and my crew wouldn't be there; my Bradley CO g[o]t out and showed them we were American and that smooth[ed] everything over.

The Veteran also reported, "[O]ne night we stopped and an Iraqi BMP wondered into [t]he middle of us and all of the sudden we started firing, escalated from small fire to big fire, there were rounds going everywhere." 

The examiner determined that both stressors were related to the Veteran's fear of hostile military or terrorist activity. 

After clinical testing and mental status examination, the VA examiner, a clinical psychologist, opined that the Veteran's symptoms did not meet the diagnostic criteria for PTSD under DSM-5 criteria and that his presentation was more suggestive of a diagnosis related to an Unspecified Trauma- and Stressor-Related Disorder. The examiner noted that the Veteran's symptoms were minimal-mild and were more consistent with a diagnosis of Unspecified Trauma- and Stressor-Related Disorder. The examiner explained that this category applied to presentations in which symptoms characteristic of a trauma- and stressor-related disorder that caused distress or impairment but did not meet the full criteria for any of the disorders in the trauma- and stressor-related disorders diagnostic class to include adjustment disorders and PTSD. The examiner noted that sleep disturbance/ insomnia, depressive and anxiety features were secondary to primary diagnosis and did not warrant a separate diagnosis. The examiner opined that the Veteran's Unspecified Trauma- and Stressor-Related Disorder was at least as likely as not (50 percent or greater probability) caused by or a result of period in military service during the Gulf War.

Although VA examiners have been reluctant to diagnosis PTSD, the July 2015 VA psychologist considered the Veteran's reports regarding his fear of hostile military activity and determined his clinical picture and history were consistent with an Unspecified Trauma- and Stressor-Related Disorder diagnosis. The Veteran's stressors have been related to the Veteran's fear of hostile military or terrorist activity and the VA psychologist related his psychiatric disorder to his period of Persian Gulf War service. 

In this case, the claimed stressor is consistent with the places, types, and circumstances of the Veteran's service and his MOS as a cavalry scout at the beginning of the Persian Gulf War in January 1991. Thus, in the absence of clear and convincing evidence to the contrary, the Veteran's lay statements alone establish the occurrence of the claimed in-service stressors.

The July 2015 VA examination report satisfies the requirements for service connection for an acquired psychiatric disorder, variously diagnosed, based on fear of hostile military action. Thus, resolving all doubt in the Veteran's favor, the criteria for service connection for an acquired psychiatric disability, regardless of varying diagnoses, are met.


ORDER

Entitlement to service connection for an acquired psychiatric disorder, variously diagnosed, is granted.


REMAND

The Veteran seeks service connection for a left shoulder disorder.

The Veteran's active duty treatment records are absent complaints, findings or diagnoses of any left shoulder injury or disorder during service. On the Report of Medical History completed by the Veteran in June 1991, he denied having painful or "trick" shoulder. On National Guard examination in November 1998, nine months after the Veteran's discharge from active service, his upper extremities were evaluated as normal. On the Report of Medical History completed by the Veteran in November 1998 in conjunction with his physical, he denied ever having swollen or painful joints and painful or "trick" shoulder. 

Private treatment records indicate that in January 2003, the Veteran reported a four-week history of left subscapular pain. At that time on onset, it was noted that the Veteran only stated that he had a stiff neck, but subsequently developed, in addition to the left subscapular pain, pain radiating down the left arm and numbness in the fourth and fifth digits of the left hand. Subsequently, the pain became more generalized throughout the left arm and seemed to be most severe at his elbow. He states that two years prior, at Christmas, he was awakened with left neck and left arm pain, but that after a couple of weeks of conservative management, it went away. His symptoms in January 2003 had not cleared and in fact had worsened after a four week period despite appropriate conservative management. After physical examination and MRI of the cervical spine which showed mild ridging with disc bulging at C5-6 to the left, the Veteran was diagnosed as having C5-6 displaced sic, cervical spondylosis, and cervical radiculopathy.

On National Guard examination in February 2005, the Veteran's upper extremities were evaluated as normal. On the Report of Medical History in February 2005, the Veteran denied swollen or painful joints and painful shoulder. 
Army National Guard medical records indicate that the Veteran presented in December 2006 with a three-week history of left shoulder pain, noted with weight lifting activity, localized along anterolateral aspect of biceps. The Veteran described his pain as a pinching pain with a warm sensation localized without radiation, 6/10. The Veteran denied any numbness or tingling but reported some weakness due to pain. The Veteran reported waking up with pain, that pain increased with range of motion, and that pain decreased with rotating arm. Physical examination demonstrated no ecchymosis, edema, erythema, or obvious deformity. He demonstrated full active range of motion and 4/5 strength during forward flexion and internal rotation compared to the right shoulder (5/5). Assessment was tendonitis supraspinatus. A consultation sheet notes a three-week history of left shoulder pain with forward flexion against resistance, 4/5 strength, and a history of C5-6 and C6-7 anterior discectomy and fusion secondary to bulging disc in 2005. 

Service connection may be granted for disability resulting from disease or injury incurred during active duty for training (ACDUTRA), or injuries suffered during inactive duty training (INACDUTRA) to include when a cardiac arrest or a cerebrovascular accident occurs during such training. See 38 U.S.C.A. §§ 101(24), 106.

Reserve and National Guard service generally means ACDUTRA and INACDUTRA. ACDUTRA is full time duty for training purposes performed by Reservists and National Guardsmen pursuant to 32 U.S.C.A. §§ 316, 502, 503, 504, or 505. 38 U.S.C.A. § 101(22); 38 C.F.R. § 3.6(c). Basically, this refers to the two weeks of annual training that each Reservist or National Guardsman must perform each year. It can also refer to the Reservist's or Guardsman's initial period of training. INACDUTRA includes duty, other than full-time duty, performed for training purposes by Reservists and National Guardsmen pursuant to 32 U.S.C.A. §§ 316, 502, 503, 504, or 505. 38 U.S.C.A. § 101(23); 38 C.F.R. § 3.6(d). Basically, this refers to the twelve four-hour weekend drills that each Reservist or National Guardsman must perform each year. These drills are deemed to be part-time training.
In this case, the Army National Guard Retirements Points History Statement prepared in July 2007 notes that between April 2006 and April 2007, the Veteran had no periods of active duty for training or inactive duty training periods.

The Veteran underwent VA examination in July 2007. Following physical examination and x-rays, the Veteran was diagnosed as having left shoulder tendonitis (impacted by left cervical radiculopathy). The examiner opined that the left shoulder condition was less likely than not related to chronic lumbosacral strain due to lack of proximity of joint involved. X-ray of the left shoulder demonstrated no radiographic signs of recent or remote fracture or dislocation and no significant arthritic changes. Subacromial space was within normal limits. 

MRI of the left shoulder in December 2007 showed small full thickness tear of rotator cuff at the insertion of the supraspinatus tendon on the greater tuberosity and questionable small SLAP tear.

The Veteran underwent VA examination in December 2010 at which time he was diagnosed as having radiculopathy/tendonitis. After review of the claims file and physical examination of the Veteran, the examiner determined that the Veteran's left shoulder disorder was less likely as not caused by or a result of the in-service diagnosis of lumbar spine in-service event. The examiner opined that the Veteran's left shoulder pain was most likely related to the Veteran's rotator cuff tear and supraspinous rupture and that the symptoms were also less likely related to cervical spine condition as the symptoms persisted after the cervical spine discectomy. The examiner further opined that there was no nexus between the lumbar spine and the shoulder radiculopathy/tendonitis.

Although the December 2010 VA examiner noted that the Veteran's left shoulder pain were more likely related to rotator cuff tear and supraspinous rupture and less likely related to cervical spine condition, the examiner did not specifically indicate whether or not any of the service-connected disabilities aggravated the Veteran's left shoulder disorder. The July 2007 VA examiner diagnosed the Veteran as having left shoulder tendonitis (impacted by left cervical radiculopathy) which implies some relationship. As such, the Board finds that an additional VA examination by an orthopedic physician is needed.

The Veteran also contends that the symptoms associated with his service-connected right tibial stress fracture are more severely disabling than reflected by the current noncompensable rating. He presented testimony in July 2016 to the effect that he thought that his symptoms were worse than when he was last examined by VA.

The United States Court of Appeals for Veterans Claims (Court) has held that when a Veteran alleges that his service-connected disability has worsened since he was previously examined, a new examination may be required to evaluate the current degree of impairment. See Snuffer v. Gober, 10 Vet. App. 400, 403 (1997). Thus, the Veteran should be provided an opportunity to report for a current VA orthopedic examination to ascertain the current status of his service-connected right tibial stress fracture.

Accordingly, the case is REMANDED for the following action:

1. The Veteran should be requested to indicate if he has received any VA or non-VA medical treatment for his left shoulder and service-connected right tibial stress fracture that is not evidenced by the current record. If so, the Veteran should be provided with the necessary authorizations for the release of any treatment records not currently on file. These records should then be obtained and associated with the claims folder. The Veteran should be advised that he may also submit any evidence or further argument relative to the claim at issue.

2. The Veteran should be afforded the appropriate VA examination for (a) an etiology opinion of all current chronic left shoulder disorders and (b) a current assessment of his service-connected right tibial stress fracture. The examiner is to be provided access to Virtual VA and VBMS and must specify in the report that these records have been reviewed. All pertinent symptomatology and findings should be reported in detail. Any indicated diagnostic tests and studies should be accomplished.
 
(a) The examiner should identify all current chronic left shoulder disorders and for each such disorder, provide an opinion as to 

(i) whether it is at least as likely as not that such disorder had its clinical onset during active duty service or is otherwise related to active duty service; or 

(ii) whether it is at least as likely as not that such disorder was caused or aggravated by a service-connected cervical spine degenerative disc disease or chronic lumbosacral strain. If aggravated, the examiner should specify the baseline of disability prior to aggravation, and the permanent, measurable increase in disability resulting from the aggravation.

It would be helpful if the examiner would use the following language, as may be appropriate: "more likely than not" (meaning likelihood greater than 50%), "at least as likely as not" (meaning likelihood of at least 50%), or "less likely than not" or "unlikely" (meaning that there is a less than 50% likelihood). The term "at least as likely as not" does not mean "within the realm of medical possibility." Rather, it means that the weight of medical evidence both for and against a conclusion is so evenly divided that it is as medically sound to find in favor of that conclusion as it is to find against it. The physician should provide a complete rationale for any opinion provided. 

(b) In accordance with the latest worksheets for rating lower leg and ankle disabilities, the physician is to provide a detailed review of the Veteran's pertinent medical history, current complaints, and the nature and extent of his right tibial stress fracture disability. A complete rationale for any opinions expressed must be provided.

3. The Veteran is hereby notified that it is his responsibility to report for the examination and to cooperate in the development of the claim. The consequences for failure to report for a VA examination without good cause may include denial of the claim. In the event that the Veteran does not report for the aforementioned examination, documentation should be obtained which shows that notice scheduling the examination was sent to the last known address. It should also be indicated whether any notice that was sent was returned as undeliverable.
 
4. After the development requested has been completed, the examination report should be reviewed to ensure that it is in complete compliance with the directives of this REMAND. If the report is deficient in any manner, corrective procedures should be implemented. 

5. The case should be reviewed on the basis of the additional evidence. If the benefit sought is not granted in full, the Veteran and his representative should be furnished a Supplemental Statement of the Case and be afforded a reasonable opportunity to respond before the record is returned to the Board for further review.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).


______________________________________________
MICHAEL D. LYON
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs